MANFRED L. MROCZKOWSKI, Plaintiff-Appellant, *v.* STRAUB CLINIC & HOSPITAL, INC., Defendant-Appellee, and JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; ROE "NON-PROFIT" CORPORATIONS 1-10; and ROE GOVERNMENTAL ENTITIES 1-10, Defendants

NO. 11160

(CIVIL NO. 77598)

FEBRUARY 6, 1987

BURNS, C.J., HEEN AND TANAKA, JJ.

## OPINION OF THE COURT BY BURNS, C.J.

In this action alleging medical malpractice and negligent failure to obtain the patient's informed consent to surgery, plaintiff Manfred L. Mroczkowski (Mroczkowski) appeals the November 7, 1985 judgment in favor of defendant. Straub Clinic & Hospital, Inc. (Straub). We affirm.

At the close of Mroczkowski's evidence to the jury, the trial court granted Straub's motion under Rule 50(a), Hawaii Rules of Civil Procedure (HRCP), and directed a verdict in favor of Straub on Mroczkowski's claim that Straub negligently failed to obtain his informed consent before treating him. The directed verdict was based on Mroczkowski's failure to introduce any expert testimony as to what specific risks of harm Straub was obligated to disclose to him prior to the August 12, 1980 myocutaneous cross-leg flap surgical operation. The issue on appeal is whether the directed verdict was error. Our answer is no.

During the evening of July 29, 1980 Mroczkowski was struck by an automobile while walking along a street in Hilo, Hawaii. He was airlifted to Straub in Honolulu, Hawaii. Immediate emergency surgery saved much of his severely injured left leg, but on August 1, 1980 his left leg was amputated four inches below the knee. On August 12, 1980 he underwent a myocutaneous cross-leg flap operation (the August 12, 1980 operation) which involved attaching a part of his right leg to his left leg in an attempt to heal the stump and save the knee of the left leg. Steel pins inserted into holes drilled through each leg held both legs in a relatively fixed position. On September 8, 1980 the steel pins were removed. Mroczkowski was discharged from Straub on October 1, 1980 and treated as an outpatient. He was readmitted on November 8, 1980 because of an infection in his right leg. He was discharged two weeks later. On March 4, 1981 Mroczkowski consulted a doctor in San Francisco who on March 10, 1981 further amputated Mroczkowski's left leg through the knee joint.

Mroczkowski's San Francisco doctor opined that Straub's failure to amputate Mroczkowski's left leg through the knee joint on or before August 12, 1980 was negligence that caused both Mroczkowski's unnecessary suffering from that time until March 10, 1981 and the unnecessary August 12, 1980 operation which deformed and scarred

Mroczkowski's right leg.

Mroczkowski testified that with respect to his right leg he experiences both a constant dull ache where the steel pins were inserted and frequent cramps.

Mroczkowski admitted that his signature appears on a consent to the August 12, 1980 operation but does not remember signing it. All he recalled knowing about the August 12, 1980 operation before it happened was that some tissue was to be taken from his right leg and the benefit would be that he would not have a pegged left leg.

The jury responded to the special verdict form as follows: 1. Was Straub negligent? Yes. 2. Was the negligence of Straub a legal cause of the injury to Mroczkowski? No.

Mroczkowski raised six issues on appeal. We find no merit in five and summarily reject those. We will discuss the remaining issue whether Straub negligently failed to obtain Mroczkowski's informed consent to the August 12, 1980 operation.

At the close of Mroczkowski's evidence, Straub moved for a directed verdict under Rule 50(a), HRCP, on Mroczkowski's claim that Straub negligently failed to disclose to him the risks of harm presented by the August 12, 1980 operation. Straub argued that Mroczkowski was required to but did not introduce expert testimony as to what specific harm Mroczkowski suffered that Straub was required to inform him of before the August 12, 1980 operation. The lower court granted the motion.

At oral argument on appeal, Mroczkowski argued alternatively that (1) he did not consent because he was an incapacitated person as defined in Hawaii Revised Statutes (HRS) § 560:5-101(2) (1976) and neither of his parents consented, see HRS § 551-35 (1976), or (2) he consented but his consent was not an informed consent because Straub failed to perform its duty of disclosure or (3) that even assuming that he was not an incapacitated person when he signed the consent to the August 12, 1980 operation and that he was given full disclosure before he signed it the evidence precluded a directed verdict on the issue of his consent to the August 12, 1980 operation.

Since alternative (1) was not litigated at trial, it is not an appealable issue. *Oceanic Foundation v. Kondo,* 53 Haw. 1, 486 P.2d 396 (1971).

Alternative (3) was not raised in the portions of Mroczkowski's opening brief containing his points and questions presented as required by Rules 28(b)(4) and (6), Hawaii Rules of Appellate Procedure, and

thus may be disregarded. *See Mahoney v. Mitchell,* 4 Haw. App. 410, 668 P.2d 35 (1983). Moreover, upon a review of the record we conclude that Mroczkowski failed to satisfy his burden on appeal with respect to alternative (3). *See Shishido v. State,* 4 Haw. App. 321, 666 P.2d 608 (1983); *Bd. of Directors of the Ass'n of Apt. Owners v. Regency Tower Venture,* 2 Haw. App. 506, 635 P.2d 244 (1981). Consequently, only alternative (2) remains for discussion.

As we noted in *Leyson v. Steuermann,* 5 Haw. App. 504, 705 P.2d 37, 46-47 (1985), the tort of a physician's negligent failure to disclose the risks of harm prior to treatment involves the following five material elements: (1) the physician owed a duty to disclose to the patient prior to treatment the risk of the harm suffered by the patient; (2) the physician negligently performed or failed to perform his or her duty of disclosure; (3) the patient suffered the harm; (4) the physician's negligent performance or nonperformance of duty was a cause of the patient's harm in that: (a) the physician's treatment was a substantial factor in bringing about the patient's harm and (b) the patient, acting rationally and reasonably, would not have undergone the treatment had he or she been properly informed of the risk of the harm that in fact occurred and (5) no other cause is a superseding cause.

Whether the patient has introduced evidence sufficient to prove material element (2) cannot be determined until the information the physician was required to disclose under material element (1) is initially determined. As noted in *Leyson,* there are four possibly applicable statements of the general standard of information the physician is required to disclose: (A) all collateral hazards that the physician knew of or should have known of, *Nishi v. Hartwell,* 52 Haw. 188, 191, 473 P.2d 116, 119; (B) all risks of harm that a competent physician acting reasonably would have disclosed, *Nishi v. Hartwell,* 52 Haw. 188, 195-97, 473 P.2d 116, 121; (C) all probable risks of harm that the physician knew of or should have known of, Act 219, § 2, 1976 Haw. Sess. Laws 523, 24; or (D) all recognized serious possible risks of harm and complications that the physician knew of or should have known of, plus other information. Act 223, § 1, 1983 Haw. Sess. Laws 468, 469.

No matter which of the above four alternative general standards applies, the physician does not have to disclose any risk of harm where (1) disclosure is precluded by an emergency situation, (2) the patient has waived his or her right to receive the information, (3) disclosure would be harmful to the patient, or (4) the risk is obvious. *Leyson,* 5 Haw. App.

at ___, 705 P.2d at 45. In cases where one or more of these limitations on the physician's duty to disclose are at issue, the physician has the initial burden of going forward with evidence pertaining to them. Thereafter, the patient has the ultimate burden of proving their nonexistence. *Id.*

In *Leyson* we stated that it was not clear from the language or history of HRS chapter 671 whether the legislature's intent was to supplant *Nishi's* stated general standards of required disclosures. *Leyson,* 5 Haw. App. at ___, 705 P.2d at 46. Upon further consideration we conclude that initially, on June 9, 1976, Act 219, *supra,* and subsequently, on June 8, 1983, Act 223, *supra,* modified the description of the general standards of required disclosures announced in *Nishi.*

Act 219 (1976) directed the board of medical examiners (board) to specifically itemize the probable risks and effects of each specific treatment or surgical procedure. It made the resulting specific itemizations, if any, prima facie evidence of what the physician was required to disclose to the patient before obtaining the patient's informed consent.

Act 223 (1983) asked the board to establish specific standards for health care providers to follow in disclosing information to a patient before obtaining the patient's informed consent. It made the board's specific standards, if any, admissible as evidence of the required specific standards of care only if the board's specific standards are designed to reasonably inform the patient of, *inter alia,* the recognized serious possible risks and complications of each specific treatment or surgical procedure.

Since under both Acts 219 and 223 the board's specifically itemized components of the statutory general standard are relevant evidence of the applicable general standard, it necessarily follows that the statutory general standard is the applicable general standard.

Thus, in 1980, HRS § 671-3 (1976)[1] required the physician to specifi-

---

[1]As we noted in *Leyson v. Steuermann,* 5 Haw. App. 504 n. 7, 705 P.2d 37, 45 n. 7 (1985), HRS § 671-3 was amended effective June 8, 1983 to require disclosure of:

    (1) The condition being treated;

    (2) The nature and character of the proposed treatment or surgical procedure;

    (3) The anticipated results;

    (4) The recognized possible alternative forms of treatment; and

    (5) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, and in the recognized possible alternative forms of treatment, including non-treatment[.]

cally itemize to the patient or the patient's guardian "the probable risks and effects of the proposed treatment or surgical procedure," which is description (C) above. If the board had developed the specifically itemized components of that statutory general standard as contemplated by HRS § 671-3(b) (1976), then Mroczkowski would not have been required to prove them because, as stated in the statute, the board's itemization would have been prima facie evidence of the specific information required to be given. As noted in *Leyson,* however, the board did not comply with HRS § 671-3(b) (1976) because there are too many medical and surgical procedures. *Leyson,* 5 Haw. App. at ___ n.7, 705 P.2d at 45 n.7. Consequently, Mroczkowski was required to prove the specifically itemized components of the statutory general standard. More specifically, Mroczkowski was required to prove by proper evidence that the harm he is complaining about was a probable risk of the August 12, 1980 operation and that Straub knew or should have known of that fact. There is no proof in Mroczkowski's evidence of this essential element of his cause of action.

Affirmed.

*John Simpson (Valta A. Cook, Sharon A. Merkle,* and *J. Gregory Turnbull* on the briefs; *Case, Kay, & Lynch* of counsel) for plaintiff-appellant.

*William A. Bordner (Jan M. Tamura* with him on the brief) for defendant-appellee Straub Clinic & Hospital, Inc.

---

Consequently, as of June 8, 1983, the applicable general standard of information the physician is required to disclose is description (D) in the text above. We do not answer the question whether the seriousness of the risk is to be answered from the point of view of the patient, the physician, or otherwise. *See* Note, *Leyson v. Steuermann: Is there Plain Error in Hawaii's Doctrine of Informed Consent?,* 8 U. Haw. L. Rev. 569, 590 (1986).